IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BAY THI LE,                          )
                                     )
                Plaintiff,           )
                                     )        No.  O6-673-HU
      v.                             )
                                     )
MICHAEL J. ASTRUE[1],                )
Commissioner of Social               )
Security,                            )        OPINION & ORDER
                                     )
                Defendant.           )
                                     )
_____

Richard A. Sly
1001 S.W. Fifth Avenue, Suite 310
Portland, Oregon 97204

Linda Ziskin
3 Monroe Parkway, Suite P, PMB #323
Lake Oswego, Oregon 97035

      Attorneys for Plaintiff

/ / /

/ / /

_____

      [1] On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security.  He is substituted as the
defendant in this action pursuant to Federal Rule of Civil
Procedure 25(d)(1) and 20 U.S.C. § 405(g).

1 - OPINION & ORDER

1    Karin J. Immergut
     UNITED STATES ATTORNEY
2    District of Oregon
     Neil J. Evans
3    ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
4    Portland, Oregon 97204-2902

5    David J. Burdett
     SPECIAL ASSISTANT UNITED STATES ATTORNEY
6    Social Security Administration
     701 5th Avenue, Suite 2900 M/S 901
7    Seattle, Washington 98104-7075

8        Attorneys for Defendant

9    HUBEL, Magistrate Judge:

10       Plaintiff Bay Le brings this action for judicial review of the

11   Commissioner's final decision to deny Supplemental Security Income

12   (SSI).  This Court has jurisdiction under 42 U.S.C. §§ 405(g) and

13   1383(c)(3).  Both parties have consented to entry of final judgment

14   by a Magistrate Judge in accordance with Federal Rule of Civil

15   Procedure 73 and 28 U.S.C. § 636(c).  The Commissioner's decision

16   is affirmed in part and reversed and remanded in part.

17                        PROCEDURAL BACKGROUND

18       Plaintiff applied for SSI on December 21, 2001, alleging an

19   onset date of October, 16, 1998.  Tr. 69-72.  Her application was

20   denied initially and on reconsideration.  Tr. 35-39, 42-44.

21       On July 23, 2003, plaintiff, represented by counsel, appeared

22   for a hearing before an Administrative Law Judge (ALJ).  Tr. 651-

23   79.  On November 7, 2003, the ALJ found plaintiff not disabled.

24   Tr. 14-26.  The Appeals Council denied plaintiff's request for

25   review of the ALJ's decision.  Tr. 6-9.

26       Plaintiff appealed to this Court and the parties stipulated to

27   a remand back to the ALJ.  Tr. 695-96.  Plaintiff, represented by

28   counsel, appeared for a second hearing before the ALJ on March 23,

2 - OPINION & ORDER

2006.  Tr. 861-81.  On April 6, 2006, the ALJ again found plaintiff not disabled.  Tr. 680-93.  Because the Appeals Council did not assume jurisdiction of the case, the ALJ's January 25, 2006 decision became the final decision of the Commissioner.  20 C.F.R. § 416.1484.

FACTUAL BACKGROUND

Plaintiff alleges disability based on cervical sprain, lumbar sprain, bilateral shoulder sprain, bilateral elbow pain, and depression.  Tr. 147.  At the time of the March 23, 2006 hearing, plaintiff was forty-seven years old.  Tr. 866.

The record contains conflicting evidence regarding plaintiff's education.  In a disability report form completed in January 2002, plaintiff indicated that she completed twelfth grade.  Tr. 153. However, during the first hearing before the ALJ, she testified that she dropped out of high school in the tenth or eleventh grade. Tr. 657.  In 2001, she had a four month training in hospital office work.  Tr. 153, 658.  The ALJ found, after both the first and second hearing, that plaintiff had "more than a high school education." Tr. 25, 692.  Plaintiff has not taken issue with that finding.  Her past relevant work includes machine operator, electrical assembler, small parts assembler, and labeler.  Tr. 17.

I.  Medical Evidence

On October 16, 1998, plaintiff was diagnosed by an emergency room physician with thoracic muscle strain, and placed on light-duty work for one week, limiting the lifting and use of her right arm.  Tr. 238.  Plaintiff attributed her pain to the repetitive nature of her assembly line job in which she frequently pulled and moved computer printers with her right hand.  Id.

3 - OPINION & ORDER

A few days later, plaintiff saw Dr. Bryan Miller, D.O., who diagnosed a repetitive strain disorder. Tr. 249. He kept her on limited duty, prescribed Lodine[2], and referred her to physical therapy for six visits over two weeks. Id. He also noted her complaint of generalized fatigue and poor well being, suggesting that this was a concern, but was unrelated to her shoulder pain. Id.

Dr. Miller saw plaintiff again on October 26, 1998, and continued to assess her as having an overuse repetitive disorder of the right wrist and shoulder, and low back. Tr. 244. Id. He upgraded her limited work activity, releasing her to do sedentary activity with sitting up to eight hours, standing or walking not over two hours per day, and no repetitive motion with her shoulder, elbow or wrist. Id.

Plaintiff then saw chiropractic physician Dr. Daniel White, D.C., for a series of visits between October 29, 1998, and November 19, 1998. Tr. 251-60. He took her off of work from October 29, 1998, to November 18, 1998, while treating her for cervical strain and sprain, right shoulder sprain and strain, and costovertebral sprain/strain. Id. X-rays ordered by Dr. White revealed a marked straightening of the upper cervical spine. Tr. 259. A CT scan of the mid-thoracic spine found a probable Schmorl's node[3] at T6. Tr.

---

[2]  A non-steroidal anti-inflammatory medication.

[3]  "Schmorl's disease" is defined as the "[h]erniation of the nucleus pulposus." F.A. Davis, Taber's Cyclopedic Medical Dictionary 1282 (14th ed. 1981). A "Schmorl's node" is "an upward and downward protrusion . . . of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae." www.medterms.com.

4 - OPINION & ORDER

258.

From the end of November 1998 to early May 1999, plaintiff was seen by physiatrist Dr. Victoria Carvalho, M.D.  Tr. 323-92.  At her initial visit on November 20, 1998, Dr. Carvalho diagnosed plaintiff as suffering from cervical, thoracic, lumbosacral, bilateral shoulder, and elbow sprain, secondary to an on-the-job injury of October 12, 1998. Tr. 386.  Dr. Carvalho found extremely marked muscle spasms in the left side of plaintiff's neck, over the left supraspinatus and infraspinatus, and over the right thoracic paraspinals.  Id.  Plaintiff was also tender in these areas and was almost tearful on palpation and range of motion  Id.  Dr. Carvalho recommended physical therapy and prescribed Soma[4] to help her sleep, as well as Naprelan[5].  Tr. 387.  She took her off of work for two weeks.  Id.

Two weeks later, plaintiff reported that the physical therapy was helping and that the Soma and Naprelan upset her stomach.  Tr. 379.  On physical examination, Dr. Carvalho found continued muscle spasms in the bilateral cervical paraspinals, left side greater than the right, muscle spasms in the right thoracic paraspinals, and tenderness in the cervical, thoracic, and lumbosacral spine.  Id.  All ranges of motion in the neck, mid, and low back were limited and painful.  Id.  She assessed plaintiff as having mild improvement in her neck, mid back, low back, shoulder, and elbow pain since the previous visit.  Id.  She continued plaintiff off of

---

[4]  A muscle relaxant.

[5]  A non-steroidal anti-inflammatory medication.

5 - OPINION & ORDER

work for another two weeks.   Id.

Dr. Carvalho continued to see plaintiff approximately every two weeks, noting no or mild improvement in her pain, until May 3, 1999.  Tr. 328-29, 338, 341, 352-53, 354, 355, 359, 362, 366, 371, 375.  A bone scan of the T6 area ordered by Dr. Carvalho was within normal limits.  Tr. 362.  At the February 1, 1999 office visit, Dr. Carvalho deferred additional physical therapy, although two weeks later, Dr. Carvalho reported that plaintiff was receiving physical therapy once per week.   Id.

At the February 15, 1999 office visit, Dr. Carvalho recommended that plaintiff try working two hours per day beginning in March.  Tr. 359.  Dr. Carvalho completed a physical capacities evaluation on February 26, 1999, releasing plaintiff back to modified work.  Tr. 357.  She concluded that plaintiff could not squat, climb, twist, or crawl at all, and could occasionally bend. Id.  She also stated that plaintiff could occasionally lift or carry 0-10 pounds.  Id.  She rendered no opinion about plaintiff's ability to lift or carry heavier weights.  Id.  She also restricted plaintiff's ability to push or pull or reach above the shoulders with either her left or right hand/arm.  Id.  She found she could sit 1-2 hours per day total, if she changed her position every 30 minutes for 10-15 minutes.  Id.  She limited plaintiff to working 2 hours per day from March 3, 1999, to March 10, 1999, and then to 4 hours per day from March 10, 1999, to March 17, 1999.  Id.

Plaintiff worked on March 3, 1999, and March 4, 1999, and then called Dr. Carvalho complaining that she was in too much pain to continue.  Tr. 354.  Dr. Carvalho took her off work until March 22, 1999, and then again until April 5, 1999.  Tr. 352, 354.  On April

6 - OPINION & ORDER

5, 1999, Dr. Carvalho reported that plaintiff was seeing chiropractic physician Dr. Dwight Harper, D.C., two to three times per week and that plaintiff believed she was slightly benefitting from this treatment.  Tr. 341.  Plaintiff was no longer having acupuncture or physical therapy.  Id.  Dr. Carvalho kept plaintiff off of work through April 19, 1999, and scheduled her for an independent medical exam (IME) on April 7, 1999.  Id.

On April 19, 1999, plaintiff reported to Dr. Carvalho that the chiropractic treatments provided only temporary relief.  Tr. 338.  In response, Dr. Carvalho recommended continuing those treatments for one to two more weeks and then discontinuing if they were not helpful.  Id.

On May 3, 1999, Dr. Carvalho stated that plaintiff had been medically stationary since April 19, 1999, and that she should see a rheumatologist to rule out fibromyalgia.  Tr. 335.  On May 7, 1999, Dr. Carvalho stated that plaintiff was to return to work on May 19, 1999, doing 8 hours a day of sedentary to light work.  Tr. 333.  She also stated that plaintiff could lift a maximum of 15 pounds, and could frequently lift 10 pounds or less.  Id.; Tr. 329.

On that same date, Dr. Carvalho issued a closing evaluation of her treatment of plaintiff.  Tr. 328-29.  Dr. Carvalho noted that plaintiff's pain levels had not changed much during the entire time she had been seeing her.  Tr. 328.  She continued to assess plaintiff as having cervical, thoracic, lumbosacral, bilateral shoulder, and bilateral elbow sprain.  Id.

Dr. Carvalho noted that the physical capacity evaluation that plaintiff underwent was invalid for impairment rating purposes and could not serve as a basis for work release because there were many

7 - OPINION & ORDER

inconsistencies in plaintiff's behavior and performance, making the collected data unreliable. Tr. 329. Dr. Carvalho stated that at the time, plaintiff was taking no pain medication. Id. Finally, on May 21, 1999, Dr. Carvalho wrote that at work, plaintiff needed a five minute break for stretching every 30-60 minutes. Tr. 323, 326.

During her treatment with Dr. Carvalho, plaintiff underwent an IME by both Dr. Brian Denekas, M.D., and Dr. Gregory Strum, M.D., of Oregon Medical Evaluations, Inc. Tr. 310-14. Dr. Denekas completed the written report of the evaluation and first noted that plaintiff appeared to be in no distress. Tr. 312. He noted that she sat comfortably during her interview and also at the examination table, but that with testing, she had "fairly dramatic pain behavior with almost collapsing-type giveway when testing for her Waddell." Id. He further noted that the range of motion testing of her low back was invalid because of plaintiff's "obvious lack of effort[.]" Id. He stated that after certain maneuvers designed to measure the flexion and extension of her low back, plaintiff stretched out her back and was able to move much farther than during the actual testing. Id.

Dr. Denekas noted that the range of motion of her neck and shoulders was also questionable due to plaintiff's lack of effort and that her strength testing showed giveway weakness in all muscle groups. Id. However, Dr. Denekas continued, there was no obvious weakness identified and furthermore, "with the effort generated [while] testing her lower extremities, [plaintiff] would not have been able to walk[.]" Id.

Dr. Denekas and Dr. Strum opined that plaintiff had no

8 - OPINION & ORDER

orthopedic or neurologic diagnoses, but that she had significant
functional overreaction to testing and significant pain behavior on
examination.    Tr. 313.    They suggested that plaintiff might have
some type of psychiatric disorder.    Id.

     As noted by Dr. Carvalho in her May 7, 1999 chart note,
plaintiff also underwent a physical capacities evaluation (PCE) in
addition to the IME.    Tr. 315-19.    As Dr. Carvalho remarked, the
results were invalid because of the inconsistencies in plaintiff's
behavior and her performance.    Tr. 315.    Six specific examples of
such inconsistencies were given in the PCE report:    1) during
measurements for neck range of motion, plaintiff displayed
approximately 20° of rotation but later, she was observed
performing some stretching exercises in which she displayed 90° of
rotation in either direction; 2) when asked to squat, she did a
half-depth squat very slowly, with facial wincing and reports of
pain but later, during the lifting test, she performed a full squat
and rise without apparent difficulty; 3) during testing of her
lumbar range of motion, she displayed minimal movement in all
planes but later during the testing, she displayed much more lumbar
flexibility; 4) she displayed global giveway weakness during manual
muscle testing in the upper extremities as well as in the lower
extremities, with the exception of the quadriceps bilaterally; 5)
grip strength measurements on the hand dynamometer had "very high
coefficients of variation, indicating inconsistency of maximal
voluntary effort," along with extremely low measurements, including
non-functional grip strength; and 6) although plaintiff complained
she could not continue with a stair climbing task after 5 times of
climbing three stairs, crossing a platform, and going down three

9 - OPINION & ORDER

steps, she then opted to climb up and over the stairs in order to respond to a question from the evaluator, even though she could have easily walked around the stairs.  Id.

As noted above, plaintiff began treating with Dr. Harper for chiropractic care, while still treating with Dr. Carvalho.  Tr. 423-63.  Plaintiff saw Dr. Harper two to three times per week.  Id. On March 15, 1999, Dr. Harper wrote to Dr. Carvalho that plaintiff's "primary pain patterns" appeared to "originate from an upper/mid back and neck myofascial pain syndrome with severe active triggers."  Tr. 445.  He explained that the "triggers make referrals to the head, neck, back and upper extremities" and that when they "are activated as with increased physical activity and/or prolonged neck and upper back flexion, they flare the patient's pain levels to a 7-8/10."  Id.  Dr. Harper further explained that plaintiff's "[s]econdary pain patterns appear to arise from restricted joint biomechanics following the myositis and muscle spasm reaction, caused by the active trigger mechanisms."  Id.  He recommended providing treatment, consisting of "manual EMS with superimposed interrupted ultrasound or EMS with heat and manipulation," three times per week for four weeks, followed by a re-evaluation at that time.  Id.

On April 5, 2000, Dr. Harper wrote that a review of plaintiff's file indicated that she was able to work only two to three hours before her neck, back, and extremity pain flared, forcing her to stop working.  Tr. 423.  He further noted that she was able to walk short distances and stand for a short time before back and extremity pain would flare.  Id.  Lifting and carrying objects also caused neck, back, and extremity pain.  Id.  He stated

10 - OPINION & ORDER

that in his opinion, the problems would persist. Id. His expectation was that plaintiff's condition would degrade rather than improve, and that further care would not be effective in resolving her condition. Id.

Following her treatment with Dr. Carvalho and Dr. Harper, plaintiff was examined on May 19, 1999, by Dr. Daniel Sager, M.D., whom plaintiff identifies as a rheumatologist. Tr. 320-22.

On physical examination, Dr. Sager noted that when plaintiff tested for lateral epicondylitis, her right hand grip was "overtly but subjectively weak" with "[l]ess than full effort suggested[.]" Tr. 321. Otherwise, plaintiff was fully compliant with the examination, but had guarded painful motion, primarily in the neck and shoulders. Id. Her neck rotation, lateral bending, flexion, and extension were all full. Id. She had full shoulder range of motion, including painless, passive range. Id. Her elbow passive joint motion was normal with no reproduction of elbow pain with the right hand grip. Id.

Dr. Sager found generalized upper body tenderness, including anterior and posterior neck, mid trapezius, medial scapular border, lumbar paraspinal, AC and SC joints, medial and lateral epicondyles of the elbows, and forearms, including radial and volar. Id. She denied pain to palpation of the forehead and thumbnail, which Dr. Sager noted were "fibromyalgia 'control points.'"[6] Id. In the lower extremities, she had tenderness in the lateral hips, buttocks, medial knees, but also over the patella. Id. Her hips,

---

[6] Dr. Sager does not explain what he meant by the use of the phrase "control points."

11 - OPINION & ORDER

1  knees, ankles, small joints of the hands and feet, and wrists, were
2  within normal limits.  Id.

3      Dr. Sager diagnosed fibromyalgia syndrome, presenting
4  initially as a repetitive strain syndrome involving primarily the
5  right upper extremity, shoulder, and neck musculature.  Id.  He
6  noted that there was an "[u]nknown predisposition to this poor
7  outcome from her work."  Id.  Dr. Sager also remarked that
8  plaintiff suffered from "[p]rominent related social stress."  Id.
9  He stated that plaintiff's "husband is overtly angry and
10 threatening, and offended that his wife has been found to be (by
11 his description) malingering in previous testing done.  He contends
12 that this is blatantly false[,] based on his knowledge of his
13 wife's past history and recent behavior."  Id.  Dr. Sager also
14 found that there was little possibility for an alternative
15 rheumatologic illness contributing to her pain and functional
16 restrictions.  Id.

17     Plaintiff's family doctor appears to have been Dr. Ngoccam
18 Truong, M.D., whom she saw periodically for complaints such as a
19 sore throat or gynecological issues.  E.g., Tr. 562, 563, 587.  On
20 June 19, 1999, she reported to Dr. Truong that for the past few
21 months, she had experienced off and on neck pain radiating to her
22 back and up to her head.  Tr. 556.  He diagnosed muscle pain after
23 noting a slightly restricted range of motion and tenderness.  Id.

24     On July 6, 1999, she again complained of this pain to Dr.
25 Truong, adding that it was causing a constant headache, and that
26 the back pain was causing shortness of breath.  Tr. 555.  She also
27 reported that the low back pain was radiating to her legs.  Id.  He
28 again found the range of motion of the right side of her neck

12 - OPINION & ORDER

restricted by pain and diagnosed her as suffering from headache and muscle pain. Id. He ordered a prescription (handwriting illegible), and gave her a note for work, excusing her absence from work for the next three months, until October 7, 1999. Id.; Tr. 467.

On July 27, 1999, plaintiff saw Dr. Dwight Freeman, M.D., and then saw him again in August 1999 and for the last time in November 1999. Tr. 408-18. At the July 27, 1999 visit, she related that her pain was a result of her repetitive on-the-job motion. Tr. 413. She complained of constant neck pain, daily headaches lasting one to two hours, spreading up from the right side of the neck to the temporal area through the temporomandibular joint (TMJ) area and into the periorbital areas. Id. She reported blurring vision bilaterally, accompanying the headaches, but reported no nausea or vomiting. Id.

Plaintiff reported constant shoulder pain, aggravated by activity, more on the right side than left. Id. She reported the "glenohumeral joint, posterior shoulder, and infraclavicular areas" as the painful areas of the shoulder. Id. She reported some clicking identified as scapulothoracic. Id. She reported upper extremity pain, worse on the right than left, proportional to activity levels, and present about 50% of her waking hours. Id. Plaintiff also reported upper extremity numbness in the ring and little fingers, occurring at night and waking her from sleep. Tr. 413-14.

Plaintiff reported back pain, occurring everyday and present about 50% of waking hours. Tr. 414. She noted increased pain in the mid-back if she talked a lot or breathed hard. Id. She

13 - OPINION & ORDER

reported that flexion was more painful than extension. _Id._ Her back pain was aggravated by sitting, dressing, and going up stairs. _Id._ Pain from sitting was relieved by shifting weight from one side to the other. _Id._

Plaintiff also stated she had posterior pelvic pain daily, connected to her back pain though less severe. _Id._ She also stated that she experienced lower extremity pain daily, present about 50% of her waking hours, and related to the back and posterior pelvic pain. _Id._ She stated that the pain involved the posterior thighs as far as the knees, but occasionally pain went into the lateral calves as far as the lateral ankles, but not into the feet. _Id._ She stated that her legs generally felt weak, but there was no history of focal motor deficit. _Id._

Plaintiff reported that her pain was relieved by bed rest, massage, heat, ice, stretching, and position changes, and that it was aggravated by bending, lifting, twisting, riding in a car, sitting, standing, walking, neck movement, and forceful repetitive use of the upper extremities. _Id._

After a thorough physical examination, Dr. Freeman's diagnoses were 1) a suspicion of fibromyalgia, 2) a cervical spine strain, 3) bilateral thoracic outlet syndrome, 4) status-post overuse syndrome in the right upper extremity, 5) neck pain, shoulder pain, upper extremity weakness secondary to above, and 6) consider sacroiliac joint arthritis. Tr. 417. Dr. Freeman recommended that she obtain an arthritis screen and possible management by a rheumatologist. _Id._

The next day, plaintiff returned to see Dr. Truong, who noted that she had been seen by an orthopedist, presumably referring to

14 - OPINION & ORDER

Dr. Freeman.    Tr. 554.    Dr. Truong's assessment was now one of fibromyalgia, after he noted that Dr. Freeman recommended that plaintiff see a fibromyalgia specialist.    Id.

Plaintiff returned to Dr. Freeman on August 31, 1999.    Tr. 411-12.    The lab arthritis screen was within normal limits.    Tr. 411.    She reported no change in her condition, no change in her neck and back, but increased pain at the medial aspects of her elbows.    Id.

Dr. Freeman noted that he found additional areas of tenderness which corresponded to fibromyalgia trigger points, and this, combined with her prolonged history of pain, indicated that a rheumatologic evaluation should be done.    Tr. 412.

On September 20, 1999, plaintiff was examined by orthopedic surgeon Robert A. Berselli, M.D.    Tr. 393-94.    This evaluation was conducted upon referral from the state Workers' Compensation Division.    Id.

After examining and testing her upper extremities, Dr. Berselli concluded that plaintiff was not significantly limited in her ability to repetitively use either elbow or arm.    Tr. 393. After examining and testing her cervical and lumbar spine, he concluded that plaintiff appeared to have some partial loss of ability to repetitively use her lumbar and cervical spinal areas because of a chronic cervical and lumbar sprain.    Tr. 394.

In Dr. Berselli's opinion, plaintiff was somewhat limited in her residual functional capacity.    Id.    He found that she could occasionally lift and carry 40 pounds, frequently lift and carry 25 pounds, and constantly lift and carry 10 pounds.    Id.    He concluded that she could consecutively sit for 45 minutes, stand for 45

15 - OPINION & ORDER

minutes, and walk for 45 minutes.  Id.  He believed she was permanently precluded from frequently performing activities of stooping, twisting, and crouching.  Id.  However, he opined that she had no permanent restrictions preventing her from working the same number of hours that were worked before her injury.  Id.

On October 5, 1999, plaintiff was examined by rheumatologist Dr. Ronald C. Fraback, M.D.  Tr. 397-99.  Dr. Fraback noted that plaintiff was currently taking Norflex[7] and amitriptyline[8], and used a TNS unit at night.  Tr. 397.  On physical examination, Dr. Fraback found that she was tender to palpation on the right neck, and tender over her right trapezius muscle, the medial border of the right scapula, and her lumbar spine.  Tr. 398.  He noted much guarding with lumbar motion, especially lumbar flexion.  Id.  She was unwilling to extend or abduct her shoulders much beyond 100° due to complaints of pain, but passively, Dr. Fraback was able to get full motion.  Id.  She had full internal and external rotation Id.  She was tender over her right TM joint.  Id.

Dr. Fraback's assessment was that plaintiff had a great deal of pain behavior which seemed to be a myofascial pain syndrome. Id.  He noted that there might be some element of depression and he doubted that she had a systemic process, but he ordered some screening laboratory tests.  Id.

On October 18, 1999, Dr. Fraback reported that her laboratory studies were unremarkable.  Tr. 399.  He stated that plaintiff continued to complain of wide-spread pain and indicated tenderness

---

[7]  A muscle relaxant.

[8]  A tricyclic anti-depressant medication.

almost everywhere he touched.  Id.  He thought she had a chronic
pain syndrome and indicated that there may be some underlying
psychological or cultural factors that he was unaware of.  Id.
Plaintiff reported that the Vioxx he had prescribed after the first
visit did not work any better than ibuprofen, so he recommended
that she go back to using ibuprofen.  Id.  He had no other
treatment suggestions.  Id.  He referred her back to follow-up with
Truong and noted that she might benefit from a psychological
evaluation.  Id.

     Dr. Freeman saw plaintiff one last time on November 2, 1999.
Tr. 409-10.  Dr. Freeman performed another physical examination and
noted that there was significant pain behavior during the
evaluation in the form of verbal and nonverbal pain complaints,
grimacing, and holding her back.  Tr. 410.  He recommended
obtaining a pain evaluation from Northwest Pain Center, continuing
with home exercises, and optimizing activity levels using good
pacing principles and body mechanics.  Id.

     Although there is no record of a visit with Dr. Truong on
February 8, 2000, he wrote, on that date, on what appears to be a
prescription pad, that plaintiff was "seen in our office" and "in
our opinion she was unable to work from 02/08/00 thru 05/08/00."
Tr. 547.

     On February 22, 2000, Dr. Truong saw plaintiff and noted her
complaint of right side neck pain, radiating to her right shoulder,
and low back pain.  Tr. 543.  His assessment is simply muscle pain,

17 - OPINION & ORDER

followed by some illegible handwriting.  Id.  He prescribed Vioxx.[9]
Id.  He also wrote "[n]ote to release to work."  Id.

Separately, in a letter dated February 22, 2000, Dr. Truong
wrote that plaintiff was able to return to a light duty job as of
February 22, 2000, with no lifting, carrying, pushing, pulling over
5 pounds, no standing continuously over 1 hour "each time," or
walking over 2 hours per day."  Tr. 465.

Plaintiff made similar pain complaints at a March 22, 2000
office visit with Dr. Truong, who noted that the range of motion in
her neck, upper right arm, and mid and low back, were restricted by
pain.  Tr. 542.  He prescribed Celebrex after noting a diagnosis of
muscle pain.  Id.

On March 31, 2000, Dr. Truong completed a form for Standard
Insurance Company and indicated that plaintiff suffered from
shoulder strain, back strain, cervical strain, and lumbar strain.
Tr. 540.  He described her symptoms as pain on the right side of
her neck, radiating to her right shoulder, and pain on the right
side of her back and low back.  Id.  He noted that the condition
was not primarily related to her employment or a mental disorder.
Id.  He further noted that he first saw her for this condition on
July 6, 1999, but that he had seen her for a similar condition on
October 16, 1998.  Id.  He stated that he recommended that she stop
working on July 7, 1999, because of her cervical, shoulder, arm,
mid back, and low back pain.  Tr. 541.

He noted that planned treatment included medicines and

---

[9]  A "COX-2 inhibitor" non-steroidal anti-inflammatory
medication.

18 - OPINION & ORDER

physical therapy, and that she had been prescribed Vioxx or Celebrex[10], Norflex, and a third medication which is not clearly legible. Id. He further stated that it was undetermined how long plaintiff's limitations would impair her, but he expected her condition to regress. Id. He failed to mention that he had released her to work, with restrictions, on February 22, 2000. Tr. 540-41.

On September 22, 2000, Dr. Truong wrote another letter about plaintiff's ability to work. Tr. 464. This time, he stated that she had been under his care for bone and muscle pain and that she would be able to handle a job as a dental assistant or "any job not requiring long hours of continuous sitting or standing, lifting, carrying, pushing, pulling over 10 lbs." Id.

From October 2001 to June 2002, plaintiff was treated by various personnel at the Portland Adventist Community Services Family Health Center. Tr. 479-91. At times she seems to have been examined by a registered nurse or a nurse practitioner, but there is no legible indication that she was examined by a medical doctor. Id.

She regularly complained of neck, shoulder, back, and jaw pain. E.g., Tr. 486, 485, 482 (Oct. 4, 2001, Dec. 4, 2001, Feb. 4, 2007). At times she was assessed with chronic, unresolved lower back pain, insomnia, depression, and chronic TMJ. Tr. 483, 484, 485. In January 2002, plaintiff indicated that her symptoms had improved on Celebrex. Tr. 483. But, in June 2002, she continued

---

[10] A "COX-2 inhibitor" non-steroidal anti-inflammatory medication.

19 - OPINION & ORDER

to complain of shoulder, neck, and back pain.  Tr. 479.

During her treatment at the Adventist Family Health Center, plaintiff had cervical and lumbar spine x-rays which were normal. Tr. 490, 491.  She also had a single session with a physical therapist who opined that her subjective complaints and multiple sites of pain and tenderness were not consistent with a shoulder repetitive motion injury.  Tr. 487.  The therapist also stated that he did not feel that further exercises would be beneficial unless a part of a long term "myofaxial" treatment plan.  Id.

While receiving treatment at the Adventist Family Health Center, and at the request of vocational rehabilitation/Disability Determination Services (DDS), plaintiff underwent a psychological evaluation on January 30, 2002, by Duane D. Kolilis, Ph.D., and a comprehensive rheumatology examination on April 24, 2002, by Dr. Tatsuro Ogisu, M.D.  Tr. 468-74, 475-77.

After taking a comprehensive history and administering certain mental status tests, Dr. Kolilis concluded that there was evidence "to support some functional overlay, in the form of secondary gain, that is reinforcing her pain behavior."  Tr. 472.  He further opined that she was not malingering.  Id.  He noted that "muscular bracing" by plaintiff was "clearly observable," and that the source of the "behavior may be due to a physical response to pain that has become habitual, or due to emotional stress, or both."  Id.  He stated that muscular bracing behavior can lead to considerable pain that is not observable through most objective measures, "e.g. stress headaches."  Id.

In Dr. Kolilis's opinion, plaintiff had the criteria to support a major depressive disorder and it was a significant

20 - OPINION & ORDER

contributory factor in maintaining her pain behavior.  <u>Id.</u>  He thought that a possible source of her depression could be unresolved anger toward her husband.  <u>Id.</u>  He opined that there was insufficient evidence of psychopathology severe enough to significantly limit her capacity to function independently.  <u>Id.</u>

Dr. Kolilis indicated that plaintiff was capable of understanding and following at least 1-2 step instructions.  <u>Id.</u> It was possible, he thought, that with psychiatric medication and counseling, for plaintiff to significantly improve her depression as well as the muscular bracing that he thought maintained her pain problem.  <u>Id.</u>  He stated that "[o]verall attention and concentration abilities were impossible to assess accurately due to translation difficulties" and his opinion that plaintiff's "efforts were less than forthright."  <u>Id.</u>  He estimated that she functioned in the average range of intellectual abilities.  <u>Id.</u>

He assessed her as having a pain disorder, associated with both psychological factors and a general medical condition, and a recurrent, unspecified major depressive disorder.  <u>Id.</u>  He assessed her Global Assessment of Functioning (GAF) at 58.  Tr. 473.

Dr. Ogisu obtained information from plaintiff regarding the medical history of her present illness and her functional limitations.  Tr. 475-76.  Plaintiff told him she could sit continuously for 30-60 minutes, could stand for 15-30 minutes, could walk 10-20 minutes, and could lift "2 to 5-10 pounds."  Tr. 476.  She stated that she did most of the indoor household activities such as cooking, cleaning, and washing the dishes.  <u>Id.</u> She required assistance of others in lifting and carrying groceries, and vacuuming.  <u>Id.</u>  She did drive.  <u>Id.</u>

21 - OPINION & ORDER

1    Dr. Ogisu stated that "[p]alpation of the classic fibromyalgia

2   tender points reveals tenderness at all sites except at the elbows,

3   hips and knees bilaterally."  Tr. 477.  Dr. Ogisu concluded that

4   plaintiff had fibromyalgia.  Id.  He also noted, however, that his

5   examination was limited by decreased effort and did not reveal any

6   specific findings to suggest another etiology for her pain.  Id.

7   He also noted that she had a depressed affect.  Id.  Finally, he

8   noted that plaintiff's stated functional limitations could not be

9   substantiated on the basis of objective findings.  Id.

10   During the spring and summer of 2002, while plaintiff was

11   treating with the Adventist Family Health Center, DDS physicians

12   completed both physical and mental residual functional capacity

13   assessments, as well as a psychiatric review technique form.  Tr.

14   506-533.  These were initially completed in March and May 2002, and

15   then affirmed in August and September 2002.  Id.

16   DDS reviewing physician Dr. Mary Ann Westfall, M.D., issued a

17   physical RFC on May 6, 2002, which was affirmed by Dr. Robert

18   McDonald on September 5, 2002.  Tr. 510.  Dr. Westfall concluded

19   that plaintiff could occasionally lift or carry 10 pounds and could

20   frequently life or carry less than 10 pounds.  Tr. 507.  She

21   concluded that plaintiff could stand or walk for a total of at

22   least 2 hours in an 8-hour workday, and could sit about 6 hours in

23   an 8-hour workday.  Id.  According to Dr. Westfall, plaintiff's

24   ability to push or pull was unlimited, and she had no postural,

25   manipulative, visual, communicative, or environmental limitations.

26   Tr. 507-09.

27   On March 6, 2002, DDS psychologist Dorothy Anderson, Ph.D.,

28   completed the psychiatric review technique form.  Tr. 519-533.  She

22 - OPINION & ORDER

1   indicated that an RFC assessment was necessary.  T. 519.  She noted

2   plaintiff's diagnosis of major depression, recurrent, as well as

3   her pain disorder.  Id.  Dr. Anderson noted that plaintiff

4   demonstrated a depressive syndrome characterized by anhedonia or

5   pervasive loss of interest in almost all activities, psychomotor

6   agitation or retardation, decreased energy, feelings of guilt or

7   worthlessness, or difficulty concentrating or thinking.  Tr. 522.

8   She also noted the presence of pain for which there were no

9   demonstrable organic findings or known physiological mechanisms.

10  Tr. 525.  She indicated that plaintiff had moderate restrictions in

11  activities of daily living and in maintaining concentration,

12  persistence or pace.  Tr. 529.  Psychologist Robert Henry, Ph.D.,

13  affirmed Dr. Anderson's assessment on August 27, 2002.  Tr. 519.

14      Also on March 6, 2002, Dr. Anderson issued a mental RFC which

15  was also affirmed by Dr. Henry on August 27, 2002.  Tr. 516.  Dr.

16  Anderson found that plaintiff had moderate limitations in the

17  ability to understand and remember detailed instructions, the

18  ability to carry out detailed instructions, the ability to maintain

19  attention and concentration for extended periods, and the ability

20  to complete a normal workday and workweek without interruptions

21  from psychologically based symptoms and to perform at a consistent

22  pace without an unreasonable number and length of rest periods.

23  Tr. at 514-15. She found no other significant limitations.  Id.

24      She concluded that plaintiff was able to understand, remember,

25  and follow through on simple tasks and routines.  Tr. 516.  She

26  noted that plaintiff's pace was somewhat slowed because of

27  distraction due to pain and limited coping with pain.  Id.  She

28  stated that there was no indication that the workday or workweek

23 - OPINION & ORDER

would be completely undermined by these emotional/psychiatric factors. Id. She also noted that while plaintiff had mood problems and showed some pain behavior, she was socially appropriate. Id.

Beginning in March 2002 and continuing intermittently to April 2003, plaintiff sought treatment at the Outside-In Community Clinic. Tr. 492-505, 595-610. During this time, she reported pain in her neck and back, sometimes improving, and sometimes not. E.g., Tr. 505, 504, 502, 500, 498, 497, 598, 610, 605-06, (Mar. 25, 2002, Mar. 2, 2002, Apr. 4, 2002, Apr. 18, 2002, May 17, 2002, June 13, 2002, July 17, 2002, Oct. 31, 2002, Feb. 5, 2003, Apr. 10, 2003). It appears that she received acupuncture treatments and herbs for her symptoms. Tr. 492-505, 595-610.

In March 2003, someone at Adventist Community Health saw plaintiff and diagnosed her with depression. Tr. 629. She complained of fatigue and interrupted sleep, and indicated that she gets anxious and depressed. Id. She was prescribed Paxil[11]. Id.

From late April 2003 to May 21, 2003, plaintiff received chiropractic treatment at the West Burnside Chiropractic Clinic. Tr. 611-27. There, she was apparently treated for her continued complaints of pain, particularly in her neck. Id. At her last visit on May 21, 2003, the chart note indicates that she did not respond to treatment. Tr. 612.

In late July 2003, plaintiff completed a mental health intake assessment at the Intercultural Psychiatric Program, affiliated

---

[11] A selective serotonin reuptake inhibitor anti-depressant medication.

24 - OPINION & ORDER

with Oregon Health Sciences University.  Tr. 638-640.  She was formally evaluated by staff psychiatrist Dr. Lawrence Hipshman, M.D., M.P.H., on August 27, 2003.  Tr. 633-35.  He noted that at the time, her current medications included Bextra[12], amitriptyline[13], Prilosec[14], paroxetine[15], and some naturopathic medications.  Tr. 633-34.

Dr. Hipshman concluded that plaintiff suffered from a moderate to severe, and chronic, major depressive disorder.  Tr. 635.  He also diagnosed her with a pain disorder, "with predominantly psychological and possibly physiological components."  Id.  Dr. Hipshman stated that it was clear that plaintiff was "quite depressed."  Id.  Additionally, he stated, "her pain is a very particular focus in clinical care and a separate diagnosis," in his opinion, "is warranted for Pain Disorder."  Id.  He thought that most of her pain was "generated due to psychological concerns, but some residual from a worker-related stress" could not be ruled out. Id.

He assigned her a GAF of 48.  He spent considerable time explaining that her pain was real, even if it was borne out of

----

[12]  A "COX 2 inhibitor" non-steroidal anti-inflammatory drug.

[13]  A tricyclic anti-depressant medication.

[14]  A medication used to treat ulcers, heartburn, and acid reflux.

[15]  The generic name for Paxil.

25 - OPINION & ORDER

distress.  Id.  He started her on citalopram[16] and trazodone[17].  Id.
He indicated she would participate in group therapy and would come
back to see him on September 10, 2003.  Id.

On September 10, 2003, plaintiff complained about pain in her
jaw, but noted that the medications had helped her feel more
relaxed and calm, and helped her sleep.  Tr. 632.  Dr. Hipshman
noted that there was some improvement.  Id.  Much of Dr. Hipshman's
later progress notes are very difficult to read.  E.g., Tr. 851,
853, 850 (Nov. 5, 2003, Feb. 25, 2004, Apr. 14. 2004).  He did
note, however, that her GAF was 52 on November 5, 2003, and 56 on
February 14, 2004.  Tr. 851, 850.  He then assessed her GAF as 62
on June 9, 2004.  Tr. 849.  On that date, he also noted that she
was stable, and improving with medication.  Id.  He continued to
assess her GAF as 62 on August 4, 2004.  Tr. 848.

By December 2004, her GAF was 64, although Dr. Hipshman
wondered whether her daily medication use was producing
improvement.  Tr. 846.  Throughout her treatment at the
Intercultural Psychiatric Program, Dr. Hipshman continued to assess
plaintiff with higher GAF scores, including a high score of 67 in
September 2005, and a score of 65 in his last chart note on January
12, 2006.  Tr. 843, 842.

While periodically seeing Dr. Hipshman, plaintiff also
participated in individual and group therapy with the Program.  Tr.
802-41.  At an annual assessment in May 2005, her counselor

---

[16]  A selective serotonin reuptake inhibitor anti-depressant
medication.

[17]  An anti-depressant medication.

assessed her as having a GAF of 60 and noted that during her course

of treatment, her sleep and appetite had improved and that she

continued to see the psychiatrist for medication management.   Tr.

802.

II.   Plaintiff's Testimony

    A.   July 23, 2003 Hearing

    Plaintiff testified that in 2001, she participated in a four-

month hospital office work training through PCC Center, consisting

of classroom training in the morning with an afternoon internship

at Oregon Health Sciences University.   Tr. 657-58.   She finished

the classroom training, but dropped out of the internship because

of her inability to do the job.   Tr. 658.

    Plaintiff described her assembly line job for Epson and then

discussed that her pain started in the right shoulder and arm and

at first was somewhat bearable and then became worse.   Tr. 662. She

initially asked for another job at Epson, but apparently that did

not work for her.   Tr. 663-64.   She took a medical leave of

absence, and returned six months later to a different position.

Tr. 663.  She then apparently obtained another medical leave.  Id.

    She testified that at the time of the hearing, headache, lots

of pain, and depression kept her from working.   Id.  She also had

problems sleeping because of her pain which wakes her up two to

four times per night.   Tr. 664.   She was taking both Chinese

medicines and "American" medicines, and described having been

through therapy, acupuncture, physical therapy, and chiropractic

treatment.   Id.  She described her pain level as 7 or 8 on a 0-10

scale.   Tr. 665.   She also had pain when chewing food.   Id.

    Plaintiff testified that she still drives a little bit, but

27 - OPINION & ORDER

1  most driving is done by her children. Tr. 666. She stopped most
2  of her driving because she cannot turn her head around. Id. She
3  also testified that her concentration and memory had become very
4  poor. Id.

5      She described that her children take care of her. Tr. 665.
6  She does not do laundry, vacuuming, or cooking. Id. She can no
7  longer read. Tr. 666. She watches television, unless she is in
8  too much pain, in which case she goes to bed. Tr. 667. She rests,
9  lying down, five or six times per day, about 15 to 20 minutes each
10 time, and uses a hot pad, to relieve the pain. Id. She also
11 practiced Tai Chi twice per week, and went to water therapy once
12 per week. Tr. 668.

13     B.  March 23, 2006 Hearing

14     At the March 23, 2006 hearing, plaintiff testified that since
15 October 1998, she had gone back to work twice, for short periods of
16 time. Tr. 866-67. She also testified that she went to school for
17 "health care" or "medical records" but was unable to do the job she
18 trained for because she experienced pain during the internship.
19 Tr. 867; Tr. 872-73.

20     At the time of the hearing, she was attending hair stylist
21 school. Tr. 868. She had been in the program since August 2005.
22 Id. She attended school Tuesdays through Saturdays, six to eight
23 hours per day, with about two hours of that in class and the rest
24 practicing skills on clients. Tr. 868. She explained that the
25 health care job required lifting of heavy files, but with the hair
26 styling, the job is "lighter." Tr. 873-74. Even still, she feels
27 very tired and experiences pain, especially if the person has long
28 hair or a lot of "detail" work, but even though it is difficult

28 - OPINION & ORDER

1 physically, it makes her happy to do it.  Id.  She works very
2 slowly and after about 45 to 60 minutes, the pain can be difficult.
3 Tr. 875.

4     She anticipated taking the hair stylist test in August 2006.
5 Tr. 869.  She drove herself to and from school, which she said was
6 about a ten-minute drive from her house.  Tr. 870.

7 III.  Lay Witness Testimony

8     A.  July 23, 2003 Hearing

9     Plaintiff's husband Con Bui testified that he and plaintiff
10 had been married for 20 years.  Tr. 669.  He came to the United
11 States in 1987 and plaintiff followed in 1992.  Tr. 670.

12     He stated that whenever plaintiff attempts to do anything, she
13 can only do it for about 10 minutes and then she has to stop and
14 relax.  Id.  She cannot resume activity for 30 minutes.  Id.  She
15 looks very weak.  Id.  Plaintiff's husband also described that
16 plaintiff is unable to concentrate and her memory has become poor.
17 Tr. 671.

18     He testified that plaintiff and the couple's two older
19 children do the vacuuming, dusting, sweeping, and bed making.  Id.
20 He does the grocery shopping.  Id.

21     B.  March 23, 2006 Hearing

22     Plaintiff's husband Con Bui testified at the second hearing in
23 March 2006.  Tr. 875.  He testified that when she comes home from
24 hair styling school, she is totally exhausted.  Tr. 876.

25 IV.  Vocational Expert (VE) Testimony

26     VE Elayne Leles testified at the July 23, 2003 hearing.  Tr.
27 673.  She stated that plaintiff's past relevant work was as an
28 electronics assembler and tester, a small products assembler, an

29 - OPINION & ORDER

1  inflation machine operator, and a labeler or addresser.  Tr. 675.

2      The ALJ posed the following hypothetical to the VE:  a person

3  the same age as plaintiff with the same educational background and

4  work experience who could stand two of eight hours and sit six of

5  eight hours, who would require the opportunity to stand and stretch

6  at least every hour for a few moments, would only occasionally be

7  able to stoop, twist, crouch, or climb, and would be capable of

8  simple work.  Id.  In response, the VE testified that the person

9  could perform plaintiff's past relevant work of labeler, a

10 sedentary, unskilled job.  Id.

11     The VE then identified several other jobs existing in

12 significant numbers in the national economy that the hypothetical

13 person could perform:  electronics inspector, security system

14 monitor, and small parts assembler.  Tr. 676-77.

15     The ALJ then added that in addition to the above parameters,

16 the person, because of fatigue, lack of concentration, and

17 inability to persist, would miss two or more days of work per

18 month, either as a whole day or hours during the day.  Tr. 678.  In

19 response, the VE testified that the person could not maintain

20 competitive employment.  Id.

21     Leles did not testify at the second hearing in March 2006.

22               THE ALJ'S NOVEMBER 7, 2003 DECISION

23     The ALJ first found that plaintiff had not engaged in

24 substantial gainful activity since her alleged disability onset

25 date.  Tr. 18, 25.  Next, he determined that she suffered from

26 severe impairments of fibromyalgia, shoulder/neck strain,

27 depression, and a somatoform disorder.  Tr. 19, 25. He concluded,

28 however, that the impairments, whether considered singly or in

30 - OPINION & ORDER

1  combination, did not meet or equal a listed impairment.  Tr. 20,
2  25.

3      The ALJ then determined plaintiff's RFC.  He concluded that
4  plaintiff  could  perform  at  the  sedentary  level  of  physical
5  exertion, with additional restrictions. Tr. 20. He found that she
6  could not stoop, twist, crouch, or climb, and that she needed to
7  stretch once an hour for a few minutes.  Tr. 21.  He also found
8  that her mental impairments limited her simple, routine, repetitive
9  work.  Id.

10     In making this RFC determination, the ALJ rejected much of
11 plaintiff's subjective testimony.  Tr. 21-22.  He noted that the
12 medical records did not corroborate the degree of physical and
13 mental  limitation  that  she  alleged.   Id.  He also noted the
14 references by physicians to functional overlay.   Tr. 22.   He
15 further cited evidence from Dr. Berselli and Dr. Truong affirming
16 her capacity to work.  Id.

17     The ALJ further noted plaintiff's own testimony about her
18 completion of the four-month program for training as a hospital
19 records clerk.  Tr. 22.  While the ALJ noted plaintiff's stated
20 testimony that she was unable to do the internship portion of the
21 program, he concluded that her ability to successfully complete the
22 other portion of the program indicated that she could, in fact,
23 function at a higher level than alleged given her ability to
24 consistently attend class and complete her homework.  Id.

25     The  ALJ  suggested  that  while  not  determinative,  his
26 observations of plaintiff at the hearing further supported his
27 conclusion that plaintiff's testimony regarding her functional
28 level was inconsistent with her actual functional level.  Tr. 23.

31 - OPINION & ORDER

He remarked that she was able to sit continuously, despite her allegation that she was unable to do so for long periods of time, and that she moved easily and without apparent difficulty. Id.

Finally, the ALJ noted that although he believed that plaintiff's husband testified honestly, his testimony was not specific concerning plaintiff's exertional abilities. Id. The ALJ stated that plaintiff's husband commented on how other family members performed chores and that plaintiff looked weak. Id. The ALJ explained that while plaintiff may look weak and others may have taken on responsibilities that formerly belonged to plaintiff, the testimony did not help in establishing a residual functional capacity. Id.

Based on the ALJ's RFC, and the VE's testimony, the ALJ then determined that plaintiff could perform her past work as a labeler. Id. Alternatively, the ALJ, proceeding to step 5 of the sequential analysis, concluded that she could perform the jobs of electrical assembly inspector, a security system monitor, and a small parts assembler, jobs which exist in significant numbers in the national economy. Tr. 24. Thus, he concluded that plaintiff was not disabled.

NOVEMBER 1, 2005 REMAND

Plaintiff appealed the ALJ's 2003 decision to this Court. The parties stipulated to a remand, which was entered as a Judgment by Judge Ashmanskas on November, 2005. Tr. 695-96.

It provided that the Commissioner's decision was to be reversed and remanded and that on remand, the ALJ

> will hold a new hearing and: 1) reevaluate the medical evidence and articulate what weight to give to each opinion, including the medical opinions of Lawrence

Hipshman, M.D.; Bryan D. Miller, D.O.; Daniel Sager, M.D., Ronald Fraback, M.D.; Thuy C. Tran, O.D.; and the orthopedic/neurologic examination from Brian Denekas, M.D., and Gregory Strum, M.D.; 2) reevaluate the credibility of Plaintiff's subjective statements pursuant to SSR 96-7p; 3) evaluate the lay witness statements, including the opinions of Daniel White, D.C. and Dwight Harper, D.C.; 4) reevaluate Plaintiff's past work to determine if it was substantial gainful activity and therefore past relevant work; if so, determine whether Plaintiff can perform it; 5) if necessary, reevaluate step 5, obtaining vocational expert evidence consistent with the <u>DOT</u>; and 6) if warranted by the expanded record, consider the need for medical expert evidence.

Tr. 695.

## THE ALJ'S APRIL 6, 2006 DECISION

After the hearing held March 23, 2006, the ALJ issued his second decision in the case. Tr. 680-93. He again found that plaintiff had not engaged in substantial gainful activity since her alleged onset date. Tr. 684, 692. He next found that she had severe impairments of fibromyalgia, a pain disorder with psychological factors, a dependent personality disorder, and depression. Tr. 687. He concluded that these severe impairments did not singularly, or in combination, meet or equal any listed impairment. Tr. 688.

The ALJ then discussed plaintiff's RFC. <u>Id.</u> The ALJ concluded that plaintiff's subjective complaints were less than fully credible. Tr. 688-89. He noted that numerous physicians had noted exaggerated pain behavior, less than full effort given on testing, giveaway weakness, and secondary gain. Tr. 688. He concluded that such evidence supported a conclusion that plaintiff was malingering. <u>Id.</u> Additionally, he noted that due to the invalid results of her physical capacities evaluations, it was impossible to determine any actual limitations caused by

33 - OPINION & ORDER

fibromyalgia.  Tr. 688-89.

Next, the ALJ noted that there were a variety of functional capacities assessed by various practitioners at various times, including modified sedentary, modified light to medium, sedentary to light,  completely unable to work for certain time periods, and no restrictions.  Tr. 689.  The ALJ discussed that while all of the physicians may not have agreed on the actual level of functionality, they did all agree that plaintiff could engage in basic work activities on a sustained basis.  Id.  Plaintiff's belief that she is disabled was not substantiated by the objective medical findings.  Id.

The ALJ then noted that plaintiff had completed the four-month hospital records clerk training, which was inconsistent with her stated abilities.  Tr. 689-90.  He specifically mentioned her ability to drive, to consistently attend class, complete her homework, and concentrate sufficiently to complete the class.  Tr. 690.

The ALJ also noted her enrollment in beauty school, which she attended five days per week for eight hours per day.  Tr. 690. Additionally, the ALJ noted that the record revealed that plaintiff had traveled to Vietnam in 2005, and had indicated, in 2005, that she had foot pain, but only when running.  Id.

The ALJ also concluded that the testimony from plaintiff's husband did not provide information relevant to establishing a residual functional capacity.  Tr. 690.  He also found it suspect given Dr. Sager's comments about the possibility of secondary gain. Id.

The ALJ concluded that plaintiff possessed the following RFC:

34 - OPINION & ORDER

(1) the capacity to lift and carry ten pounds occasionally and less than ten pounds frequently; (2) the ability to stand and/or walk for two hours in an eight-hour workday, and the ability to sit for six hours in an eight-hour workday, but requiring the opportunity to stand and stretch at least every hour for a few moments; (3) limited to occasional stooping, twisting, crouching, or climbing; and (4) limited to simple tasks.  Tr. 691.

The ALJ then explained that at the first hearing, the VE was asked to assume a hypothetical individual with the same residual functional capacity and testified that such an individual could perform the jobs of electronics inspector, security system monitor, and small parts assembler.  Id.  Thus, he concluded that she was not disabled.

## STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991).  The claimant bears the burden of proving disability.  Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; see

35 - OPINION & ORDER

1  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
2  disabled.

3      In step three, the Commissioner determines whether the
4  impairment meets or equals "one of a number of listed impairments
5  that the [Commissioner] acknowledges are so severe as to preclude
6  substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20
7  C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is
8  conclusively presumed disabled; if not, the Commissioner proceeds
9  to step four.  Yuckert, 482 U.S. at 141.

10     In step four the Commissioner determines whether the claimant
11  can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e),
12  416.920(e).  If the claimant can, he is not disabled.  If he cannot
13  perform past relevant work, the burden shifts to the Commissioner.
14  In step five, the Commissioner must establish that the claimant can
15  perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§
16  404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its
17  burden and proves that the claimant is able to perform other work
18  which exists in the national economy, he is not disabled.  20
19  C.F.R. §§ 404.1566, 416.966.

20     The court may set aside the Commissioner's denial of benefits
21  only when the Commissioner's findings are based on legal error or
22  are not supported by substantial evidence in the record as a whole.
23  Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a
24  mere scintilla," but "less than a preponderance."  Id.  It means
25  such relevant evidence as a reasonable mind might accept as
26  adequate to support a conclusion.  Id.

27                              DISCUSSION

28     Plaintiff contends that the ALJ erred in the following
36 - OPINION & ORDER

1   respects:  (1) the ALJ should have found plaintiff disabled based

2   on the "grids"; (2) the ALJ failed to comply with the Remand Order

3   by not obtaining new VE testimony and by failing to discuss the

4   testimony of Dr. Harper; (3) the ALJ improperly rejected the

5   opinions of treating and examining physicians; (4) the ALJ

6   improperly rejected plaintiff's testimony and failed to consider

7   plaintiff's pain; (5) the ALJ failed to pose a complete

8   hypothetical to the VE; and (6) the VE's testimony departed from

9   the Dictionary of Occupational Titles.  I address plaintiff's

10  arguments in turn.

11  I.  The Grids

12      Plaintiff argues that she is disabled based on the grids,

13  because she is a "[y]ounger individual age 45-49," she is

14  illiterate or unable to communicate in English, and her previous

15  work experience is unskilled. 20 C.F.R. Pt. 404, Subpt. P, App. 2,

16  Table 1.  Plaintiff argues that her ability to speak English is so

17  marginal that she should fall under Rule 201.17, the part of the

18  relevant grid for persons who are illiterate or unable to

19  communicate in English.

20      I disagree.  First, while I agree with plaintiff that there is

21  no apparent evidence in the record regarding plaintiff's ability to

22  read and write in English, the grid rule that plaintiff desires to

23  apply, Rule 201.17, does not note an ability or inability to read

24  and write English, but states that it applies when the claimant is

25  unable to "communicate" in English.

26      Second, plaintiff herself waived the use of an interpreter at

27  the second hearing and the transcript from that hearing shows that

28  while her spoken English is far from perfect, she is able to

37 - OPINION & ORDER

1  understand  and  meaningfully  and  appropriately  communicate  in

2  English.  The record does not support plaintiff's position that she

3  is  unable  to  communicate  in  English.   Thus,  grid rule 201.17,

4  mandating a conclusion of disabled, does not apply.

5  II.  Compliance with the Remand Order

6       Plaintiff  argues  that  the  Remand  Order  compels  the  ALJ  to

7  obtain  additional  VE  testimony  at  the  second  hearing  and  that  by

8  not  doing  so,  the  ALJ  violated  the  Order  and  the  ALJ's  decision

9  must be reversed.  I disagree.

10      This  portion  of  the  Remand  Order  requires  the  ALJ  to  "if

11 necessary,  reevaluate step 5, obtaining vocational expert evidence

12 consistent  with  the  DOT[.]"   Plaintiff  argues  that  the  modifying

13 language  of  "if  necessary,"  applies  only  to  the  ALJ's  decision  to

14 engage  in  a  step  5  evaluation  and  once  the  ALJ  proceeds  to  a  step

15 5  analysis,  the  ALJ  was  required  to  obtain  new  VE  testimony.

16 Plaintiff's  interpretation  of  the  sentence  to  mean  that  the  ALJ's

17 discretion  was  limited  to  whether  to  proceed  to  step  5  analysis  and

18 not  whether  to  rely  on  VE  testimony,  is  not  unreasonable.   However,

19 I  do  not  read  this  language  as  compelling  the  ALJ  to  obtain  new  VE

20 testimony at the second hearing.

21      A  VE's  testimony  is  required  when  non-exertional  limitations

22 are  present.   Widmark v. Barnhart,  454 F.3d 1063, 1070 (9th Cir.

23 2006).   Thus,  such  testimony  was  required  here.   However,  while  the

24 ALJ's  prior  decision  was  vacated  upon  remand,  tr.  699,  the  VE's

25 testimony  from  the  first  hearing  was  not  stricken  and  was  part  of

26 the  record.   Because  the  ALJ  made  no  change  to  the  RFC,  there  was

27 no  need  to  obtain  new  VE  testimony.   It  was  not  error  for  the  ALJ

28 to  rely  on  the  VE  testimony  from  the  first  hearing  when  the

38 - OPINION & ORDER

1  relevant evidence presented to the VE in terms of the plaintiff's
2  RFC, was unchanged.

3       Plaintiff also argues that the ALJ did not comply with the
4  Remand Order because he failed to discuss Dr. Harper's treatment of
5  plaintiff.   The Remand Order specifically directed the ALJ to
6  "evaluate the lay witness statements, including the opinions of
7  Daniel White, D.C. and Dwight Harper, D.C."

8       The ALJ did mention Dr. White in his April 6, 2006 decision,
9  but he failed to discuss Dr. Harper's treatment and opinions.
10  Defendant argues that any such error is harmless because the ALJ
11  has no duty to address a chiropractor's opinion in any event and
12  further, because a chiropractor is not a scientist and cannot speak
13  as any kind of medical source or expert, his testimony or opinion
14  fails to conform to current scientific norms and standards and
15  thus, must be rejected.

16       I reject defendant's argument that the ALJ has no duty to
17  address a chiropractor's opinion.   Although a chiropractor's
18  opinion is not an acceptable medical source for evidence of
19  impairment, see 20 C.F.R. § 404.1513(a), this does not mean that
20  the ALJ can simply ignore it because it was not based on the
21  techniques that are acceptable for medical testimony.   The ALJ in
22  this case had a duty to discuss Dr. Harper's testimony not only
23  because the ALJ has a duty to discuss any lay witness's testimony,
24  but here, the ALJ was specifically directed to discuss Dr. Harper's
25  treatment and opinions in the Remand Order.

26       Like other lay witnesses, a chiropractor may offer information
27  to help the ALJ understand how plaintiff's impairment affects her
28  ability to work.   20 C.F.R. § 404.1513(d).   The standard for

39 - OPINION & ORDER

evaluating and discussing lay witness testimony is noted in Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).  If the ALJ rejects lay witness testimony, the ALJ must articulate reasons germane to the witness.  Id.

Here, defendant's argument regarding the scientific expertise of Dr. Harper, or lack thereof, may meet the Dodrill standard. But, as explained in Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003), the district court may not affirm an ALJ based on the district court's own independent findings.  Rather, the court is "constrained to review the reasons the ALJ asserts."  Id. (holding that it was error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss).  The discussion of Dr. Harper's treatment and opinions must be conducted by the ALJ in the first instance.  His failure to do so was error.

III.  Rejection of Opinions of Treating & Examining Physicians

In her opening memorandum, plaintiff identifies 11 separate treating or examining practitioners the ALJ allegedly failed to discuss.  But, as defendant notes, and as plaintiff concedes in her reply memorandum, this argument was mistakenly based on the ALJ's 2003 decision, not the 2006 decision which is at issue in this appeal.

In her reply memorandum, plaintiff narrows her argument to the ALJ's discussion of four practitioners:  Drs. Hipshman, Miller, Sager, and Fraback.  She complains that the Remand Order required the ALJ to articulate the weight given to each practitioner's opinion and that the ALJ has failed to do.  She further complains that the ALJ's cursory recitation of some medical facts, without

40 - OPINION & ORDER

1  analysis, does not satisfy the standard for rejection of this
2  medical evidence.

3      Plaintiff is correct that the Remand Order stated that the ALJ
4  was to reevaluate the medical evidence and "articulate what weight
5  to give to each opinion[.]"    But, I reject plaintiff's
6  interpretation of this language to the extent it requires the ALJ
7  to expressly articulate what level of weight he gave to a
8  particular practitioner's opinion.    Rather, the weight the ALJ
9  ascribed to each opinion is inherent in his acceptance or rejection
10 of the opinion.    As long as the ALJ complied with the appropriate
11 standard for rejection, the Remand Order was not violated.

12     Dr. Hipshman and Dr. Miller were treating physicians, and Dr.
13 Sager and Dr. Fraback were examining physicians.    The Commissioner
14 must provide clear and convincing reasons for rejecting the
15 uncontradicted opinion of a treating or examining physician.
16 Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).    If the
17 treating or examining physician's opinion is contradicted by
18 another doctor, the Commissioner may reject it for specific and
19 legitimate reasons that are supported by substantial evidence in
20 the record.    Id. at 830-31.

21     The ALJ first discussed Dr. Hipshman's evaluation of plaintiff
22 as part of determining whether her impairments were severe.    Tr.
23 687.    He noted that Dr. Hipshman initially assessed her with a GAF
24 of 48, indicating severe symptoms and/or limitations.    Id.    The ALJ
25 noted that Dr. Hipshman reassessed her GAF at 55, indicating
26 moderate symptoms, not long after the initial GAF 48 assessment,
27 and that her functioning score stayed at about this level, with
28 periodic decreases to 50 and periodic increases to as high as 68.

41 - OPINION & ORDER

1 | Id.

2 |     The ALJ then stated that Dr. Hipshman's assessment was

3 | accorded little weight as it was based on his one-time evaluation,

4 | with no objective testing to support her subjective complaints or

5 | to corroborate her reported limitations. Tr. 689. The ALJ also

6 | explained that plaintiff's initial GAF assessment was rendered in

7 | late August 2003, but within a few weeks, it was 55, where it

8 | stayed with little variance. Id.

9 |     The ALJ's reasoning for rejecting Dr. Hipshman's August 2003

10 | GAF assessment of 48 contains some minor errors, but is essentially

11 | sound. Dr. Hipshman saw plaintiff periodically from August 2003 to

12 | January 2006, and thus it is inaccurate to suggest that his was a

13 | one-time examination. But, a careful reading of the ALJ's opinion

14 | shows that the ALJ indicated that the GAF 48 assessment was based

15 | on a one-time evaluation. This is an accurate statement of the

16 | record. Dr. Hipshman rendered that particular assessment after his

17 | initial evaluation of plaintiff and not in the context of a

18 | longstanding relationship.

19 |     I cannot confirm in the record that Dr. Hipshman's GAF

20 | assessment rose from 48 on August 27, 2003, to 55 by September 13,

21 | 2003, as the ALJ states, because the ALJ does not cite to a

22 | specific page and I find no entry by Dr. Hipshman for an

23 | examination done on that date. But, by November 2003, Dr. Hipshman

24 | assessed plaintiff as having a GAF of 52, and as the ALJ accurately

25 | reported, her assessed GAF remained in the mid-50s, with periodic

26 | highs into the mid-60s, throughout her treatment at the OHSU

27 | psychiatric program. Thus, the ALJ correctly indicated that the

28 | initial GAF assessment of 48 was well below all of the other

42 - OPINION & ORDER

assessments, including one done within three months of the assessment.

The ALJ's reasoning for rejecting Dr. Hipshman's assessment is supported by the record and he provides clear and convincing reasons for rejecting the initial GAF 48 assessment. Moreover, here, there can be no complaint that the ALJ failed to comply with the Remand Order because he specifically articulated that he was giving Dr. Hipshman's assessment little weight.

The ALJ noted that Dr. Miller assessed plaintiff with a modified sedentary functional capacity. Tr. 689. The ALJ initially remarked that this assessment was one of many differing assessments, "covering a wide range of overall ability." Id. The ALJ rejected Dr. Miller's assessment because it was "rendered just after the claimant had sustained her on-the-job injury." Id. Implicit in this reasoning is that the ALJ gave Dr. Miller's assessment little or no weight. As indicated above, there was no reason for the ALJ to expressly state the effect of his reasoning using those particular words.

Also implicit in this reasoning is that because Dr. Miller's assessment was rendered within days of plaintiff sustaining her on-the-job injury, and right at her alleged onset date, and because over the next several years there have been a wide variety of assessments made, Dr. Miller's assessment is of little value because it was rendered when her injury was acute and thus, is not an assessment of her functional ability after a period of stability.

The ALJ's rationale is specific and legitimate, and is supported by substantial evidence in the record.

43 - OPINION & ORDER

The ALJ stated that examining physician Dr. Fraback evaluated plaintiff in October 1999 and had noted that plaintiff had widespread pain complaints with a great deal of pain behavior.  Tr. 686.  Although this is the extent of the ALJ's comments about Dr. Fraback, it is unclear why plaintiff takes issue with the ALJ's treatment of Dr. Fraback's opinion.

As noted above, Dr. Fraback assessed plaintiff as having a myofascial pain syndrome and perhaps some element of depression. Tr. 398, 300.  The ALJ, however, found that plaintiff had severe impairments of fibromyalgia "with a history of pain complaints," "a pain disorder," and depression.  Thus, the ALJ did not reject Dr. Fraback's assessment.

Additionally, Dr. Fraback did not make any functional capacity assessments so there is no argument that the ALJ erred by failing to incorporate any such limitations in plaintiff's RFC.

Finally, the ALJ discussed examining physician Dr. Sager's May 1999 evaluation of plaintiff.  Tr. 686.  The ALJ discussed Dr. Sager's findings, noting in particular that Dr. Sager had diagnosed plaintiff with fibromyalgia syndrome, and had alluded to a possible secondary gain issue.  Id.  The ALJ rejected Dr. Sager's diagnosis because there was no objective evidence of any disorder, Dr. Sager himself noted plaintiff's "less than full effort" and "subjective weakness," and Dr. Sager had noted that plaintiff and her family needed to be open to the idea of recognizing and removing any barriers to improvement or issues of secondary gain.  Id.

Although the ALJ rejected Dr. Sager's diagnosis, as noted above, the ALJ found that fibromyalgia was one of plaintiff's severe impairments.   It appears that the ALJ's opinion is

44 - OPINION & ORDER

internally inconsistent by rejecting Dr. Sager's diagnosis on the one hand, and accepting it on the other.  Because the ALJ found that plaintiff had fibromyalgia, there is no need to address the apparent rejection of this physician's diagnosis of fibromyalgia. Moreover, Dr. Sager made no recommended functional capacity limitations so there is no basis for arguing that the ALJ improperly rejected any such limitations.

In sum, the ALJ did not violate the Remand Order by failing to adequately address any treating or examining physician's findings and opinions.  The ALJ also did not violate the Remand Order by failing to specifically articulate what level of weight he attached to any particular opinion of a treating or examining practitioner. The ALJ's reasoning meets the required legal standard.

IV.  Plaintiff's Testimony

Plaintiff argues that the ALJ improperly rejected her subjective testimony.  She contends that the ALJ failed to give clear and convincing reasons for rejecting her testimony.  She notes, in particular, that the ALJ's finding that plaintiff was malingering is unsupported.

In the Ninth Circuit, once a claimant produces objective medical evidence of an impairment or impairments and shows that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). When determining the credibility of a plaintiff's limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in

45 - OPINION & ORDER

testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain when determining whether a claimant's complaints of pain are exaggerated. Id.

In support of his determination that plaintiff's subjective testimony was only partially credible, the ALJ primarily relied on three reasons: (1) evidence supported a conclusion that she was a malingerer; (2) all physicians have opined that plaintiff is capable of work at one time or another and in one capacity or another and while they may disagree on the actual level of functionality, plaintiff's testimony that she is completely disabled from work is not substantiated by the medical findings; and (3) her testimony was inconsistent with her daily activities and performance of household chores. Tr. 688-90.

Putting aside the disputed conclusion that plaintiff is a malingerer, the record still supports the ALJ's conclusion. As the ALJ noted, aside from some short-term restrictions from all work, all of the treating and examining practitioners who rendered an opinion on her functional capacity, have opined that she is capable of some level of functioning, ranging from sedentary to light to medium. Additionally, as the ALJ described, despite her complaints of pain, she has been able to attend classes, including an eight-hour per day, five day per week hairstyling class which had lasted over a period of seven months at the time of the second hearing, had traveled to Vietnam, and performed some household chores.

46 - OPINION & ORDER

1  These are clear and convincing reasons, supported by substantial
2  evidence in the record, for rejecting plaintiff's subjective
3  testimony.

4  V.  Hypothetical Presented to the VE

5      Plaintiff contends that the ALJ failed to present a complete
6  hypothetical to the VE because the ALJ failed to incorporate
7  certain limitations assessed by Dr. Miller, Dr. Carvalho, and Dr.
8  Kolilis.  As noted above, plaintiff, in her reply brief, points to
9  only Dr. Miller's opinion as having been improperly rejected by the
10 ALJ.  As discussed above, the ALJ gave appropriate reasons to
11 reject Dr. Miller's assessment and thus, there was no error in the
12 ALJ's failure to incorporate Dr. Miller's functional limitations in
13 the hypothetical posed to the VE.

14     As detailed above, Dr. Carvalho issued more than one
15 assessment of plaintiff's limitations.  She first noted certain
16 limitations in late February 1999, when she initially released
17 plaintiff back to work.  Tr. 357.  Then, however, in May 1999,
18 more than two months later, she issued a final closing evaluation
19 of her treatment with plaintiff, including an assessment of her
20 functional limitations as of that date.  Tr. 333.  At that time,
21 she stated that plaintiff would return to work as of May 19, 1999,
22 performing 8 hours per day of sedentary to light work, with a
23 maximum lifting capacity of 15 pounds, and the ability to
24 frequently lift 10 pounds or less.  Id.; Tr. 329.  She also added
25 that plaintiff needed a five minute break for stretching, eery 30-
26 60 minutes.  Tr. 323, 326.

27     The problem here is that the ALJ's RFC is not inconsistent
28 with Dr. Carvalho's May 1999 assessment.  And, while the initial

47 - OPINION & ORDER

assessment she rendered in February 1999 contained some additional limitations, it is important to note that that assessment was given in conjunction with plaintiff's first return to work.  The May 1999 assessment, given at the conclusion of her treatment and as part of her closing evaluation, undeniably represents Dr. Carvalho's assessment of plaintiff's functional limitations for the foreseeable future.

The ALJ's RFC limited plaintiff to lifting and carrying 10 pounds occasionally and less than ten pounds frequently, to standing and or walking for two hours in an eight-hour day and sitting for six hours in an eight hour day, but with the opportunity to stand and stretch every hour for a few moments, and occasional stooping, twisting, crouching, or climbing.  Tr. 691. As defendant notes, this RFC does not contradict Dr. Carvalho's May 1999 limitations.  The only discrepancy is that the ALJ included the ability to stretch for a few moments, while Dr. Carvalho indicated five minutes.  I find the difference immaterial.

Finally, plaintiff argues that the ALJ failed to consider Dr. Kolilis's explanation of the "interrelationship of Plaintiff's pain with the resulting functional limitations, and failed to include these limitations in the vocational hypothetical."  Pltf's Mem. at p. 21.  Plaintiff then argues that "[s]ince vocational testimony that 2 absences per month would render a worker unable to sustain competitive employment is already contained in the record, no further administrative proceedings are necessary."  Id.

The problem with plaintiff's argument about Dr. Kolilis is that he does not opine that plaintiff will miss 2 days of work per month.  In fact, he renders no specific opinion about her ability

48 - OPINION & ORDER

1   or inability to work. Tr. 473. As noted above, he concluded she

2   suffered from a pain disorder associated with both psychological

3   factors and a general medical condition, as well as a major

4   depressive disorder. Tr. 472. But, he also stated that there was

5   evidence to support some functional overlay, in the form of

6   secondary gain. Tr. 472. He further noted that her major

7   depressive disorder likely predates her injury and is a significant

8   contributory factor in maintaining pain behavior. Id. He also

9   noted that unresolved anger towards plaintiff's husband was another

10  possible source of her depression. Id.

11      Then, he stated that she was capable of understanding and

12  following at least simple 1-2 step instructions and that it was

13  possible, with medication and counseling, for her to improve her

14  depression. I fail to see anywhere in Dr. Kolilis's report an

15  express discussion by Dr. Kolilis of the interrelationship of

16  plaintiff's pain with the resulting functional limitations. There

17  is no endorsement by Dr. Kolilis of plaintiff's needing to miss two

18  days of work per month. Thus, the ALJ did not err in failing to

19  incorporate such a limitation into the RFC.

20  VI.  Erroneous Vocational Testimony

21      Plaintiff first argues that the small assembly jobs identified

22  by the VE at Step 4 as "light," were then offered as "sedentary" at

23  Step 5, without explanation for the discrepancy. The plaintiff is

24  correct that in her testimony, the VE testified that plaintiff's

25  previous work included a job as a small products assembler and that

26  this job was "light, unskilled." Tr. 675. The VE later, in

27  discussing plaintiff's previous work as a "labeler," explained that

28  the number of such jobs in the national economy for that type of

49 - OPINION & ORDER

position would have to be evaluated under "assembly generally," and when the ALJ clarified that, she stated that it was for "small parts assembly" which was sedentary and unskilled.  Tr. 676-77.

While it is possible that there is no discrepancy in this testimony because, in describing her past relevant work, the ALJ could have been describing plaintiff's small products assembler position as it was performed and thus, as light and unskilled, and in describing the labeler position she could have been describing a more general small parts assembly position which she considered sedentary and unskilled, I accept, for the purposes of this Opinion, that there is a discrepancy.  I nonetheless reject plaintiff's argument that the VE testimony cannot be relied upon because the VE identified two other jobs at Step 5 that plaintiff could perform and thus, even without considering the small products assembly job for which there might be a discrepancy in the VE's testimony, the VE's remaining testimony establishes other work that plaintiff could perform in the national economy.

Plaintiff next argues that "[a]ll of the jobs identified by the vocational expert are precluded by the express terms of the ALJ's vocational hypothetical, and these are the jobs the ALJ found Plaintiff could perform."  Pltf's Mem. at p. 20.  I do not address this argument because of its lack of specificity.  As the party objecting to the ALJ's decision, it is incumbent upon plaintiff to identify the precise inconsistencies between the ALJ's vocational hypothetical and the jobs identified by the VE.  It is not this Court's burden to search through the Dictionary of Occupational Titles or to second guess the testimony of the VE without some articulation of the how the ALJ's hypothetical precludes the jobs

50 - OPINION & ORDER

1    identified by the VE.

2                            CONCLUSION

3         The Commissioner's decision is affirmed in all respects except

4    for the ALJ's failure to evaluate the statements and opinions of

5    lay witness Dwight Harper, D.C.   That part of the decision is

6    reversed and remanded for the limited purpose of conducting that

7    evaluation.

8         IT IS SO ORDERED.

9                   Dated this  18th  day of  May       , 2007.

10

11

12

13    _____    /s/ Dennis James Hubel
                                         Dennis James Hubel
14                                       United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51 - OPINION & ORDER